USBC-MD G FILED MAR
15 OCT '26 AM9:53

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION
In re 3CLogic, Inc., Debtor
Case No. 26-17338-MCR | Chapter 11

# Limited Objection and Motion for a Conditional Continuance

By Sunil Grover in his individual capacity concerning the proposed sale, related RCF2 settlement, and expedited timeline

To the Honorable Court: I respectfully request a 30-calendar-day evaluation period, measured from entry of a continuance order, with a progress review after 14 days. The purpose is to document whether an improving operating business as per financial update only very recently published on Oct 5, 2026 can refinance or restructure its existing debt under successor leadership, with new capital, and emerge from Chapter 11 with greater estate value than the proposed sale.

If the full period cannot safely be supported, I request an initial period of up to 14 days, or a shorter period the Court finds appropriate, with further time dependent on liquidity, financing progress, creditor protection, and the risk to an available sale.

**Grounds for Objection to Approval of the Asset Sale**

I object to approval of the proposed sale at this time because the company's improved operating performance and a materially changed financing and leadership alternative warrant a limited evaluation before the sale becomes irreversible.

**Improved operating performance.** The CFO's August results report ARR of $17.7 million, gross margin of 78.4%, and positive August EBITDA after identified addbacks of $232,000. These results indicate that restructuring measures are beginning to take effect. I acknowledge that year-to-date EBITDA remained negative and cash declined; current liquidity must therefore be assessed promptly.

**An identified source of equity capital and successor leadership.** Ajay Jain is willing to support an orderly leadership transition and has financial capacity, personally or through his entities, to provide the identified $4–5 million equity financing need, subject to completion of diligence and Court approval of a reorganization plan. I have received funds verification supporting that capacity. His signed declaration, supporting confirmation, funding authority, and proposed investment terms will be submitted separately as permitted.

**A concrete alternative requiring evaluation.** The proposed alternative combines improved operations, successor leadership, new equity, and refinancing or legally permissible restructuring of existing debt. Prior financing efforts included outreach to 40 prospective equity investors and 10 prospective lenders, with seven executed nondisclosure agreements. This groundwork provides a basis for focused diligence, although replacement debt financing is not yet committed.

**Potential preservation of greater estate value.** Immediate lender repayment and preservation of residual equity value can involve different economic incentives. I request a comparison of net estate and creditor recoveries, costs, and execution risks under the proposed sale and the reorganization alternative. Existing equity would be preserved only to the extent consistent with creditor rights, applicable priorities, and a feasible plan.

47

## Matters addressed and procedural posture

This filing addresses the sale motion at Docket No. 101, the RCF2 settlement motion identified as Docket No. 121 in the notice at Docket No. 124, and the related request to shorten time at Docket No. 125. The operative docket and orders control.

My sale objection concerns the timing of final approval. My settlement objection seeks deferral only to the extent needed to avoid foreclosing evaluation of an alternative, while recognizing the proposed settlement protections.

Docket No. 124 states an October 20, 2026 settlement objection deadline if shortening is granted. It identifies an October 22, 2026 sale hearing at 1:00 p.m. Eastern in Courtroom 3-C and requests a settlement hearing at that time if expedition is granted. Docket No. 130, dated October 13, identifies a missing proposed order for Docket No. 125 and a cure date of October 27. That deficiency notice does not itself deny expedition, suspend a deadline, or postpone a hearing. I am working to October 20, subject to operative orders, and do not treat the settlement notice as establishing or extending the separate sale objection deadline. I request consideration only to the extent timely and procedurally permitted.

## Investment interest and capacity

My IRA holds an investment interest in Capitan Investment Partners, LLC Series 3CLogic II ("Capitan"), which invested in 3CLogic. The 2020 Series B purchase agreement identifies Capitan as a purchaser (Exhibit E). My economic interest is indirect. I submit this filing solely in my individual capacity and do not purport to act as counsel or representative for Capitan, my IRA custodian, or other investors. I have requested Capitan authorization; an out-of-office response is not authorization. I ask the Court to determine whether I may be heard under 11 U.S.C. § 1109(b). If not, I request receipt of this information only to the extent permitted. This filing does not automatically preserve Capitan's rights.

## Operating improvement and the value at stake

The CFO's October 5 email reports August MRR of $1.47 million, up 18.2% year over year; ARR of $17.7 million, up 18%; revenue of $1.6 million; gross margin of 78.4%; and a net loss of approximately $6,000 compared with $534,000 in the prior-year month. The CFO reports August EBITDA after identified addbacks of $232,000 positive. These results support my view that restructuring measures required time to take effect and that the benefits are becoming visible. Exhibit A contains labeled email transcriptions, not an audit or the complete financial package.

The same email reports year-to-date EBITDA of negative $0.8 million and August ending cash of $0.7 million, down $0.3 million from July, with higher receivables. I do not equate adjusted EBITDA with free cash flow, assert a sustainable earnings run rate from one month, or certify current operating runway. Current cash and a short-term forecast must be obtained immediately. The alternative is to establish and fund continuity, rather than presume it.

The October 13 EVA Equity Partners, LLC agreement specifies $21.25 million in cash plus defined assumed liabilities. I believe an immediate sale at that price may crystallize a distressed value before the restructuring benefits and a changed financing proposition are fully evaluated. That is an investment judgment, not a completed appraisal. Exhibit B includes price, timing, termination, and notice provisions. I request a comparison of net estate and creditor recoveries after liabilities, costs, and execution risks, rather than a comparison of headline enterprise values alone.

## A materially changed financing proposition

The refinancing effort has included outreach to 40 prospective equity investors and 10 prospective lenders, with nondisclosure agreements executed with seven entities. I am preparing dated supporting records for supplementation. Outreach and NDAs show work and engagement, not financing commitments. Earlier efforts occurred amid Chapter 11 proceedings and uncertainty about long-term leadership given Denis Seynhaeve's stated desire to retire. I believe succession uncertainty complicated the continuing-business proposition, but do not assert that every prospect declined for that reason without supporting correspondence.

Ajay Jain has indicated willingness to support an orderly executive transition and has the financial capacity, personally or through his entities, to provide the identified $4–5 million equity financing need, subject to completion of diligence and Court approval of a reorganization plan. I have received funds verification supporting that capacity. The supporting verification is not attached to this packet; a confirmation limited to the relevant equity amount and Ajay's signed declaration will be submitted separately as permitted. His experience and indirect interest through Capitan are summarized in Exhibit C. This is a statement of capacity and conditional financing support, not a binding subscription or proof that debt refinancing has been secured. The funding entity, authority, investment terms and deployment timing remain to be documented. Equity dependent on plan approval is not an interim operating commitment; any funding gap before approval requires separate arrangements.

Denis's October 10 email states that refinancing required $4–5 million in new equity, that such backing had not been secured, and that he had no issue with the proposed transition plan (Exhibit D). That estimate must be tested against current debt, working capital, and transaction costs; it is not an independently established financing requirement. The proposed change warrants evaluation because it addresses the leadership issue and may add capital. It does not establish that refinancing will close.

## Operating continuity and creditor protection

The proposed transition would seek to preserve customer delivery, support, contractual performance, employee responsibilities, and existing operating knowledge. Subject to company agreement and required approvals, Denis would support an orderly handover and Ajay would focus initially on financing, lender engagement, and succession. Existing personnel would continue core operations. I do not represent that Denis has agreed to a particular handover schedule, Ajay has been appointed, or employees have committed to remain.

The first three days would prioritize current cash, collections, payroll, essential vendor costs, restructuring costs, required lender payments, and cash-collateral restrictions. By day seven the team would seek a validated 13-week weekly cash forecast, a quantified interim funding gap, documented capital terms, and an agreed transition plan. No undocumented funds would be counted as available. A requested extension should be shortened or brought back promptly for review if liquidity or creditor protection cannot be demonstrated. The work plan appears in Attachment 1.

The proposal would evaluate replacement debt to repay existing secured obligations and, if legally supportable, consensual debt restructuring or treatment through a confirmable Chapter 11 plan. Any nonconsensual secured treatment would require compliance with 11 U.S.C. § 1129, including applicable lien and payment protections, feasibility, and priority requirements. This continuance request does not seek immediate rewriting of the loan, plan confirmation, or management appointment. Plan-proponent rights and any exclusivity orders must be respected.

## Different economic incentives and sustained buyer interest

A secured lender may reasonably favor prompt repayment once its recovery is covered, while existing equity bears the loss of residual value from a sale. Those economic incentives can diverge. The lender's preference is relevant, but should be evaluated alongside whether a funded alternative can preserve greater estate value while respecting creditor rights. I seek preservation of existing equity only to the extent supported by the estate's value, applicable priorities, and a feasible restructuring; I do not ask creditors to bear an unquantified gamble for shareholder upside.

Based on my involvement and understanding, purchaser interest has persisted for approximately six months. That history supports requesting concrete evidence of the urgency attributed to buyer withdrawal and exploring a brief accommodation. It does not establish that EVA itself has participated for six months, that different bidders are the same buyer, or that any offer is irrevocable. The October 13 EVA agreement permits termination if a sale order is not entered by October 22 (Section 8.1(g)), sets November 5 as the Termination Date subject to the buyer's extension right (Sections 1.1 and 8.1(d)), and contains other termination rights, including concerning inconsistent plans or pleadings (Section 8.1(i)).

I therefore request that the Debtor identify the actual contractual and commercial consequences of delay and promptly seek any buyer waiver or deadline accommodation needed to preserve an available sale. A 30-day court continuance would not by itself extend the agreement or eliminate termination rights. If preserving the sale cannot be arranged, the Court should weigh that specific risk against the demonstrated financing progress and potential value, and consider the shorter fallback rather than presume the buyer cannot leave.

## Management recommendation and the related settlement

Denis's declaration, executed October 8 and filed at Docket No. 128-1 (Exhibit G), endorses the RCF2 settlement and describes concrete benefits: waivers of default interest and prepayment premiums, payment protections for administrative and unsecured creditors, and avoiding costly litigation. I acknowledge those benefits and do not contend that his transition email contradicts his declaration, that the lender's liens are invalid, or that management acted from an improper motive.

The question is whether an updated financing proposition, supported by improved operations, proposed successor leadership, and capacity for the identified equity need, deserves a bounded comparison with the currently executable sale and settlement. That comparison must account for concessions that may be conditional on the sale and may not carry over to refinancing. It should not assume that settlement claims or waivers automatically apply outside that transaction.

## Legal basis and requested relief

A sale outside the ordinary course is subject to 11 U.S.C. § 363(b); settlement approval is governed by Bankruptcy Rule 9019. Local Bankruptcy Rule 9013-7 governs continuances. These provisions provide the procedural framework for this request; they do not establish an entitlement to delay merely because equity prefers reorganization. I rely on this filing as my statement of facts and law and will not file a separate memorandum.

1. Determine whether I may be heard in my individual capacity and receive the submission only to the extent permitted.

2. Grant a 30-calendar-day evaluation period from entry of the order, with a day-14 progress review and final disposition thereafter on the Court's schedule; alternatively grant an initial period of up to 14 days, or shorter, with any remaining time contingent on an adequate showing.

3. Permit prompt filing and service of supplemental evidence, including outreach records, Ajay's signed declaration, bank evidence, and financing terms, with a day-seven submission target and updated reports by days 14 and 30, subject to deadlines set by the Court.

4. Direct timely provision, under appropriate confidentiality protections and to authorized participants, of current cash and forecast information, operating results, debt and claims information, relevant sale deadlines, and information needed for a net-recovery comparison. Request initial liquidity information within three calendar days of entry.

5. Direct the Debtor promptly to assess buyer deadline accommodations and any sufficiently documented alternative, and report actual liquidity, creditor-protection, transaction, and buyer-retention risks. Seek deferral of settlement approval only to the extent necessary; preserve beneficial provisions where feasible without prejudging approval.

6. Maintain existing cash-collateral restrictions and approvals; permit any party to seek prompt review if liquidity deteriorates, protection is inadequate, a material sale risk emerges, or financing milestones are missed. Grant other appropriate relief.

Filing this request does not stay a hearing, change an objection deadline, authorize financing, release collateral, or preserve another entity's rights. The proposed period is for diligence and an executable financing and reorganization proposal, not an assertion that Chapter 11 confirmation can be completed within 30 days.

Executed at: Campbell CA

Dated: 10/13/2026

DocuSigned by:

Signature: Sunil Grover
A4C4E7617FAF491...

Sunil Grover

Mailing address: 128 McBain Ct. Campbell CA 95008

Email: sgrover@truebluepartners.com
Telephone: 650-814-8324

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION
In re 3CLogic, Inc., Debtor
Case No. 26-17338-MCR | Chapter 11

**Declaration of Sunil Grover**

1. I am Sunil Grover. I make this declaration based on my knowledge and the identified communications. My investment judgments are distinguished from financial facts reported by others.

2. My IRA has an investment interest in Capitan Investment Partners, LLC Series 3CLogic II, which invested in 3CLogic. I do not claim personal direct ownership of the shares in Exhibit E. I do not represent Capitan or the IRA custodian in this proceeding.

3. I received the CFO's October 5 email concerning August results. Exhibit A is a labeled transcription of excerpts. I have not audited the financial figures or independently verified current cash, free cash flow, or operating runway.

4. Exhibit B contains identified pages of the October 13 EVA agreement supplied to me. I understand that the offer has been filed, but its exact docket reference and any amendments should be verified against the operative record.

5. I presented a refinancing and leadership proposal on October 9; Denis replied October 10. Exhibit D contains labeled transcribed excerpts. His reply states the estimated $4–5 million equity requirement, lack of secured backing, and willingness to consider the transition. It does not approve a financing or executive appointment.

6. Based on financing efforts known to me, outreach included 40 prospective equity investors and 10 prospective lenders, with NDAs executed with seven entities. The relevant date range is Sep 17-Oct 12. Supporting dated outreach and NDA records are being assembled. These numbers are not financing commitments.

7. Denis has expressed a desire to retire. I believe uncertainty about successor leadership complicated financing; any specific assertion that a prospect declined for that reason will be supported by the relevant correspondence. I do not attribute an improper motive to Denis's sale recommendation.

8. Ajay Jain has indicated willingness to assist in an interim or successor role. I have received funds verification supporting his ability, personally or through his entities, to provide the identified $4–5 million equity need, subject to completed diligence and Court approval of a reorganization plan. Supporting verification and his signed declaration will be submitted separately as permitted. I do not represent a binding investment or secured debt refinancing.

9. Based on my involvement and understanding, purchaser interest has persisted for approximately six months. Supporting communications and the identities and dates of the relevant bidders are being assembled. I do not assert that EVA and Partner One are the same buyer or that EVA itself participated throughout that period. I recognize the termination rights in the supplied EVA agreement.

10. Exhibit F reproduces Docket No. 124. Exhibit G reproduces Docket No. 128-1. Exhibit H reproduces Docket No. 130. I do not treat the deficiency notice as an extension or denial of expedition.

11. I have requested Capitan authorization. Tony Rickert's out-of-office response indicated limited access through October 16; that response does not authorize representation.

12. I request time to test and document feasibility. My belief that a sustainable reorganization may preserve greater value is not an appraisal, a guarantee of debt refinancing, or proof that operations can already fund an additional 30 days.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed at: Campbell CA

Dated: 10/13/2026

DocuSigned by: Sunil Grover
A4C4E7617FAF491...

Signature: ____________________

Sunil Grover

Mailing address: 128 McBain Ct. Campbell CA 95008

Email: sgrover@truebluepartners.com
Telephone: 650-814-8324

## Attachment 1 Thirty day evaluation plan

Days are calendar days measured from entry of an order granting time. Work depends on timely access, management cooperation, and required approvals. Sunil would coordinate; Ajay's participation and the Debtor finance team's responsibilities require their agreement. The Court's order controls actual deadlines.

| Timing | Deliverable | Proposed responsibility |
|---|---|---|
| Before relief | Seek preliminary cash/runway confirmation, Ajay's signed intent, and buyer deadline accommodations; establish filing capacity and service. | Sunil with counsel, Ajay, Debtor |
| Days 1 to 3 | Obtain cash, receivables collections, payroll, essential payments, debt claims, cash-collateral orders and contract deadlines. Identify immediate gaps and bidder identities. Seek buyer waiver or extension. | Debtor finance and counsel; proposed team |
| By day 7 | Validate a 13-week cash forecast and interim gap; document Ajay's $4–5 million equity capacity, entity, authority, diligence and plan-approval conditions, and supporting confirmation. Prepare the agreed handover. File and serve available supplements. | Finance team; Ajay; Sunil; counsel |
| By day 14 | Report cash versus forecast, funded runway, debt-service analysis, active lender diligence, written financing indications, buyer accommodation and net-recovery comparison. Request remaining time only on demonstrated progress. | Proposed team and Debtor; Court review |
| By day 30 | Complete financing diligence to the extent accessible; submit documented financing terms, sources and uses, creditor treatment, leadership plan and executable reorganization proposal with unresolved conditions identified. | Proposed team and authorized plan proponents |

Existing cash-collateral orders remain operative. Undocumented funds are excluded from liquidity. Seek prompt Court review if essential obligations cannot be paid, cash-use authority expires, creditor protection is inadequate, buyer termination changes the comparison, or funding milestones are missed. Further extensions require approval. The final proposal must address all creditor classes, liquidity, fees, equity and dilution, confirmation requirements, and exclusivity.

**Exhibit index**

Exhibit A: CFO October 5 email excerpts on August results; labeled transcription, not full financial package.

Exhibit B: October 13 EVA agreement selected PDF pages 1, 2, 4, 9, 14, 28, 29, 32, 36, 37, 41, 42 and 45, covering price, financing, timing, termination, notices and execution. Full agreement and operative court record control.

Exhibit C: Ajay biography and supplied two-page professional profile; no appointment or funds verification.

Exhibit D: October 9–10 correspondence; labeled transcribed excerpts.

Exhibit E: 2020 Series B agreement PDF pages 1 and 34 identifying Capitan; does not independently prove current ownership or IRA interest.

Exhibit F: Docket 124 notice, all four supplied pages; referenced settlement exhibit and mailing matrix were not supplied.

Exhibit G: Denis declaration at Docket 128-1, all five supplied pages.

Exhibit H: Docket 130 deficiency notice dated October 13, all one supplied page.

Reserved supplemental labels, not attached evidence: I outreach, NDAs and purchaser history; J Ajay's executed declaration; K bank evidence; L financing terms and comparison. The separate completion templates must be verified, completed and signed where applicable before filing.

# Exhibit A
# CFO Email Excerpts Reporting August 2026 Results

Source: October 5, 2026 email from B. Erwin J. Tenorio, subject "3CLogic Financial Package - August 2026," forwarded in the October 9 correspondence. These are transcribed excerpts; intervening text is omitted. The attached underlying financial package is not reproduced here.

### MRR

For the month of August, MRR was $1.47M compared to $1.25M for the PY month, an 18.2% increase.

### ARR

ARR was $17.7M, $2.7M higher compared to August 2025, up by 18%. During the month, the Company added two new logos and did not lose any customers.

### Revenue and gross margin

Revenue for the month of August was $1.6M, $71k higher than the prior month mainly due to the increase in Professional Services revenue ($30k), Voice AI revenue ($20k) and Telecom ($10k). YTD Revenue was $11.7M, $1.0M or 10% higher compared to PY YTD revenues.

Gross Margin for August was $1.25M and 78.4% of Total Revenues, $74k higher compared to the prior month. YTD Gross Margin was $9.1M and 77.5% of Total Revenues, $0.8M higher than the prior year.

### Net loss

Net Loss for August was $6k, $528k lower than PY month of $534k. YTD Net Loss was $2.7M, $0.9M better than PY YTD Net Loss of $3.6M.

### EBITDA

During August 2026, total addbacks amounted to $238k ($183k interest, $50k restructuring legal fees and $4k due diligence accounting work). Resulting August EBITDA was $232k positive.

YTD August total addbacks were $1.9M (interest was $1.6M). August YTD EBITDA was negative $0.8M.

### Liquidity

Cash at the end of the month was $0.7M, down by $0.3M from the prior month mainly due to the $0.6M increase in Receivables and $0.2M decrease in Deferred Revenue, partly offset by the $0.4M decrease in Prepayments and $0.2M increase in Accrued Liabilities. We collected $0.8M in cash from outstanding receivables compared to $1.5M in July. In August, we billed $1.4M from customers, $0.4M higher than the prior month.

Accounts Receivable, net at the end of August, was $2.7M, $0.6M higher than the prior month. Accounts Payable was $1.0M compared to $1.1M in July, not including the maturing debt and related interest.

# Exhibit B

October 13, 2026 EVA Equity Partners, LLC asset purchase agreement.

Selected PDF pages 1, 2, 4, 9, 14, 28, 29, 32, 36, 37, 41, 42, 45 of the supplied agreement. Price, financing, timing, termination, notices and execution provisions are included. The complete agreement, schedules, operative court filing and subsequent amendments control.

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is entered into and effective as of October 13, 2026 (the "Effective Date"), by and between 3CLogic, Inc., a Delaware corporation ("Seller"), a debtor and debtor in possession under Case No. 26-17338-MCR (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the District of Maryland, Greenbelt Division (the "Bankruptcy Court"), and EVA Equity Partners, LLC, a Delaware limited liability company ("Buyer"). Seller and Buyer are together referred to as the "Parties" and each individually as a "Party."

## BACKGROUND

WHEREAS, Seller is engaged in the business of developing, licensing, providing, hosting, operating, maintaining, supporting, marketing and selling cloud-based and AI-powered contact center, communications, customer and employee engagement and customer experience software, platforms and solutions, including related artificial intelligence, automation, analytics and enterprise platform integration capabilities, and providing related implementation, integration, professional, customer success and support services, in each case as conducted by Seller and its Subsidiaries prior to and as of the Closing (the "Business");

WHEREAS, on July 9, 2026 (the "Petition Date"), Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the Bankruptcy Court, commencing the Bankruptcy Case;

WHEREAS, Buyer desires to purchase from Seller, and Seller desires to sell, assign, transfer, convey and deliver to Buyer, the Purchased Assets, free and clear of all Encumbrances, pursuant to and in accordance with sections 105, 363(b), 363(f) and 365 of the Bankruptcy Code and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), all as more fully set forth in this Agreement;

WHEREAS, in Seller's business judgment, consummation of the transactions contemplated by this Agreement is necessary to maximize the value of the Purchased Assets and recoveries for holders of claims against and interests in Seller;

WHEREAS, substantially concurrently with the execution hereof, Buyer has placed $1,062,500 (the "Deposit") into escrow in a segregated account with McNamee Hosea, P.A. by wire transfer of immediately available funds, to be credited against the Cash Purchase Price and distributed to Seller upon consummation of the Closing in accordance with Section 2.5(a) hereof or returned to Buyer in accordance with Section 8.2 hereof;

WHEREAS, the Parties acknowledge and agree that this Agreement was negotiated on an arm's length basis and in good faith; and

WHEREAS, the Parties acknowledge and agree that this Agreement is subject to the approval of the Bankruptcy Court and, subject to the terms and conditions set forth herein, will be consummated only upon entry of the Sale Order.

NOW, THEREFORE, in consideration of the foregoing recitals, which are incorporated into the agreements of the Parties herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

"Assumption Costs" means, collectively, (a) all Cure Amounts, and (b) all other costs, fees and expenses of any kind arising out of or relating to the assumption and assignment of the Assigned Contracts to Buyer, including all filing, service and notice costs, all fees and expenses of Seller and its professionals incurred in preparing, filing, prosecuting and obtaining approval of the Assumption Motion, and all costs of resolving, defending or litigating any objection to the assumption or assignment of any Assigned Contract, to any Cure Amount, or to the adequacy of assurance of future performance.

"Assumption Motion" means one or more motions filed by Seller pursuant to section 365 of the Bankruptcy Code seeking authority to assume and assign the Assigned Contracts to Buyer and to fix and pay the associated Cure Amounts, in form and substance acceptable to Buyer in its sole and absolute discretion.

"Avoidance Actions" means any and all claims, rights and causes of action arising under sections 502(d), 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code or under any comparable provision of applicable state or federal law.

"Bankruptcy Estate" means Seller's bankruptcy estate created pursuant to section 541(a) of the Bankruptcy Code.

"Bill of Sale" means a bill of sale substantially in the form attached as Exhibit B.

"Business Day" means any day other than a Saturday, Sunday or day on which banks are authorized or required to be closed in Baltimore, Maryland.

"Business Intellectual Property" means all Intellectual Property owned or purported to be owned by Seller or any Subsidiary and used or held for use in the conduct of the Business.

"Buyer Designee" means any Affiliate of Buyer that Buyer designates pursuant to Section 2.12 to acquire any of the Purchased Assets.

"Cash Collateral Order" means any order of the Bankruptcy Court authorizing the use of cash collateral or granting adequate protection to RCF2.

"Cash Purchase Price" means Twenty-One Million Two Hundred Fifty Thousand Dollars ($21,250,000).

"Closing" is defined in Section 2.8.

"Closing Date" is defined in Section 2.8.

"Contract" means any agreement, purchase order, license, lease, sublease, contract, arrangement, understanding or commitment, whether oral or written, express or implied, to which a Person or its assets is legally bound.

"Cure Amounts" means all amounts, if any, determined by the Bankruptcy Court or otherwise required to be paid under section 365(b) of the Bankruptcy Code to cure all monetary and non-monetary defaults and to compensate for all actual pecuniary losses resulting from defaults under the Assigned Contracts, in each case in order to permit the assumption and assignment of the Assigned Contracts to Buyer.

"Sale Order" means a Final Order of the Bankruptcy Court granting the Sale Motion and approving, among other things, this Agreement and the sale of the Purchased Assets to Buyer free and clear of all Encumbrances and the assumption and assignment of the Assigned Contracts to Buyer, substantially in the form attached as Exhibit D and otherwise in form and substance acceptable to Buyer in its sole and absolute discretion.

"Security Breach" means any (a) breach of security affecting Personal Information or confidential information, or any other unauthorized access to, acquisition, use, disclosure, modification, deletion or destruction of, information, or (b) unauthorized interference with the operations or security safeguards of, or unauthorized access to, any IT Systems, including any phishing incident or ransomware attack.

"Seller's Knowledge" and "to Seller's Knowledge" mean the actual or constructive knowledge of any director, officer or employee of Seller or any Subsidiary having responsibility for the subject matter, including all knowledge that any such Person would have obtained after and assuming reasonable inquiry of the employees and records of Seller and its Subsidiaries reasonably expected to have information on the subject.

"Seller" is defined in the Preamble.

"Seller Released Parties" is defined in Section 5.7.

"Seller Releasing Parties" is defined in Section 5.7.

"Software" means all computer software and code of every kind used or held for use in the Business, including source code, object code, firmware, assemblers, applets, compilers and scripts, in each case including all documentation, comment code and development tools related thereto.

"Subsidiary" means, with respect to Seller, any Person of which Seller, directly or indirectly, owns a majority of the outstanding voting power or equity interests or otherwise has the power to elect or appoint a majority of the members of the governing body of such Person, including the Indian Subsidiary.

"Tax" or "Taxes" means all federal, state, local, municipal and foreign taxes, duties, levies, cesses, imposts, assessments, deficiencies and similar charges imposed by any Governmental Authority, including all income, corporate, minimum alternate, dividend distribution, capital gains, franchise, margin, gross receipts, real and personal property, withholding, tax deducted or collected at source, equalization levy, employment, payroll, social security, provident fund, professional, sales, use, value added, goods and services, excise, stamp, customs and transfer taxes, and any interest, penalties, fines and additions thereto, in each case whether disputed or not and whether payable directly, as a withholding or collection agent, or as a result of transferee, successor, secondary, representative or joint and several liability, by Contract or by operation of Law.

"Termination Date" means November 5, 2026, as such date may be extended pursuant to Section 8.1(d).

## ARTICLE II
PURCHASE AND SALE

2.1 Purchased Assets. Subject to and in reliance upon the terms and conditions of this Agreement and the Sale Order, at the Closing, Seller shall sell, convey, assign, transfer and deliver to Buyer or to one

(n) all fees, costs and expenses, including legal fees, accounting fees, brokerage commissions, finders' fees and similar compensation, incurred by Seller or any of its Affiliates in connection with the transactions contemplated by this Agreement, any prior or alternative sale process, or the administration of the Bankruptcy Case; and

(o) all other liabilities arising out of or relating to the Business or the ownership or operation of the Purchased Assets on or prior to the Closing Date.

2.5 Purchase Price; Payment at Closing.

(a) The consideration for the sale, conveyance, assignment, transfer and delivery of the Purchased Assets shall be (i) an amount in cash equal to the Cash Purchase Price, and (ii) the assumption of the Assumed Liabilities by Buyer's execution and delivery of the Assignment and Assumption (collectively, the "Purchase Price"). At the Closing, Buyer shall pay or cause to be paid to Seller an amount in cash equal to the Cash Purchase Price, less the amount of the Deposit, and Buyer and Seller shall cause the Deposit to be paid to Seller. For the avoidance of doubt, the Deposit and any interest thereon shall remain the sole property of Buyer unless and until it is released at the Closing.

(b) At the Closing, and on any other occasion on which any payment of cash is required to be made by Buyer to Seller under this Agreement, Buyer shall pay the entire amount then payable to such account or accounts and in such amounts as Seller directs in a written payment direction delivered to Buyer not less than three (3) Business Days prior to the date of such payment (the "Payment Direction"), in each case by wire transfer of immediately available funds.

(c) The Purchase Price is fixed and shall not be subject to any post-Closing adjustment, escrow, holdback, reconciliation, or other true-up, whether on account of working capital, net working capital, any comparison of Accounts Receivable to accounts payable or other liabilities, or otherwise. For the avoidance of doubt, (i) Buyer shall receive all Accounts Receivable of Seller as of the Closing Date as part of the Purchased Assets at no additional cost, and (ii) Buyer shall not assume, and shall receive no credit against, reduction of, or adjustment to the Purchase Price on account of, any accounts payable or other liabilities of Seller, other than customary credits with respect to the allocation of Tax obligations to the extent not sold free and clear pursuant to the Sale Order.

(d) Buyer shall prepare and deliver to Seller an allocation of the Purchase Price among the Purchased Assets in accordance with Section 1060 of the Internal Revenue Code of 1986, as amended, within ninety (90) days after the Closing Date. Seller shall not take any position inconsistent with such allocation on any Tax return or in any Tax proceeding unless required by applicable Law.

2.6 Designation Rights. Subject to the limitations set forth in this Section 2.6, Buyer shall have the sole and exclusive right, at any time prior to the Closing Date, to designate any asset of Seller, including any Contract, executory contract or unexpired lease, as a Purchased Asset or an Excluded Asset, and to add any Contract to, or remove any Contract from, Schedule 2, in each case by written notice to Seller and without any change or modification to the Purchase Price and without any liability to Buyer on account of any Assumption Cost associated with any Contract so removed. Buyer may also, at any time prior to the Closing Date, direct Seller in writing to reject any executory contract or unexpired lease that Buyer does not wish to assume by delivering written notice to Seller identifying such executory contract or unexpired lease. Upon receipt of such notice, Seller shall promptly file a motion with the Bankruptcy Court or take such other steps as are necessary to reject such executory contract or unexpired lease. Buyer shall have no liability in connection with any such rejection or any rejection damages claim arising therefrom; provided, however, that Buyer shall have no right to designate as a Purchased Asset (i) any cash or cash equivalents

do not require any approval or consent of, or filing with, any third party or Governmental Authority; and (c) will not violate any Law to which Buyer is subject.

4.2 Binding Agreement. This Agreement and each Ancillary Agreement to which Buyer is or will become a party constitute the valid and legally binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

4.3 Brokers. Neither Buyer nor any of its Affiliates has employed or retained any broker, finder or agent to act on its behalf in connection with this Agreement or the transactions contemplated hereby.

4.4 Adequate Assurance. Buyer is, and each Buyer Designee will at the Closing be, capable of providing adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Assigned Contracts to be assigned to it.

4.5 Financial Capacity. Buyer has, and at the Closing will have, sufficient cash on hand and other immediately available financial resources to pay the cash portion of the Purchase Price and to perform its obligations under this Agreement and each Ancillary Agreement.

## ARTICLE V
## COVENANTS PRIOR TO CLOSING

5.1 Cooperation. Each Party shall cooperate with the other and shall use commercially reasonable efforts to cause its Representatives to cooperate, to provide an orderly transition of the Purchased Assets to Buyer and to minimize disruption to the Business resulting from the transactions contemplated hereby. Without limiting the foregoing, during the Interim Period, Seller shall use commercially reasonable efforts to provide, and shall use commercially reasonable efforts to cause its Representatives to provide, such cooperation, information and assistance as Buyer may reasonably request in connection with the arrangement, maintenance and consummation of any debt or equity financing obtained or proposed to be obtained by Buyer in connection with the transactions contemplated hereby, including (a) providing financial, operational and other information concerning Seller, the Business and the Purchased Assets reasonably requested by Buyer or its financing sources, (b) reasonably assisting Buyer in satisfying the information and diligence requirements of its financing sources, including customary know-your-customer and similar requirements applicable to Seller, (c) making appropriate members of Seller's management reasonably available for meetings, presentations and diligence sessions with Buyer and its financing sources, and (d) providing such other customary cooperation as Buyer may reasonably request in connection with maintaining the effectiveness of, satisfying the conditions to and consummating such financing. Notwithstanding the foregoing, neither Seller nor any of its Representatives shall be required in connection with any such financing to (i) incur any out-of-pocket cost or expense that is not reimbursed by Buyer, (ii) incur any liability or obligation that is effective prior to the Closing, (iii) execute any financing agreement, security document or other instrument that would become effective prior to the Closing, (iv) provide any legal opinion, solvency certificate or other certificate regarding matters outside such Person's knowledge or responsibility, or (v) take any action that would unreasonably interfere with the operation of the Business or violate applicable Law, any Order or any obligation of confidentiality binding upon Seller. For the avoidance of doubt, Buyer's receipt or availability of any financing shall not constitute a condition to Buyer's obligation to consummate the transactions contemplated by this Agreement, and nothing in this Section 5.1 shall be construed as creating any financing condition.

5.2 Access. From the Effective Date until the Closing or the earlier termination of this Agreement (the "Interim Period"), upon reasonable advance notice and during normal business hours, Seller shall give

Buyer and its Representatives reasonable access to the management personnel, employees, properties, accounts, books, records, insurance policies, Contracts, commitments, source code repositories, systems and files relating to the Purchased Assets, and all other information Buyer may reasonably request relating to the Purchased Assets or the Business. Nothing in this Section 5.2 shall require Seller to disclose information if such disclosure would reasonably be expected to result in the loss of attorney-client privilege or violate applicable Law or any binding confidentiality obligation; provided that Seller shall use commercially reasonable efforts to provide such information in a manner that does not result in such loss or violation. For the avoidance of doubt, Buyer's receipt or availability of any financing shall not constitute a condition to Buyer's obligation to consummate the transactions contemplated by this Agreement.

5.3 Consents and Approvals. Seller shall use reasonable best efforts, at its sole cost and expense, to obtain all consents and approvals necessary to consummate the transactions contemplated hereby, and shall keep Buyer reasonably informed of the status of such efforts.

5.4 Operating Covenants. During the Interim Period, except with the prior written consent of Buyer, as required by this Agreement, or as ordered by the Bankruptcy Court, Seller shall, and shall cause each Subsidiary to, use commercially reasonable efforts to (a) maintain the Purchased Assets and the assets of each Subsidiary in the ordinary course of business consistent with past practice, (b) maintain the goodwill of the Business and preserve its relationships with customers, suppliers, employees and others having business relations with the Business, (c) maintain in force all insurance policies covering the Purchased Assets or the assets of any Subsidiary, and (d) continue to maintain, support and host the Business's software products and customer environments in the ordinary course.

5.5 Negative Covenants. During the Interim Period, except as required by Law or as ordered by the Bankruptcy Court, and without limiting Section 5.4, Seller shall not, and shall cause each Subsidiary not to, without the prior written consent of Buyer:

(a) amend, modify, reject or terminate, other than at its stated expiration date, any Contract;

(b) sell, assign, lease, convey, mortgage, license, encumber or otherwise transfer or dispose of any Purchased Asset or any material asset of any Subsidiary;

(c) solicit, offer or accept the receipt of any Account Receivable on any terms or schedule faster or more accelerated than those in effect prior to the commencement of the Bankruptcy Case, or offer any discount, rebate or other inducement for early payment;

(d) transfer or relocate any Purchased Asset to any location owned or controlled by a third party, other than in the ordinary course of business;

(e) permit any material insurance policy covering the Business, the Purchased Assets or the assets or operations of any Subsidiary to be cancelled, terminated, not renewed or materially reduced;

(f) grant any increase in compensation or benefits to, or enter into or amend any severance, retention or change of control arrangement with, any employee;

(g) disclose, deliver, license or place into escrow any source code included in the Purchased Assets, or grant any Person any right, contingent or otherwise, to require the escrow, release, delivery or disclosure of any such source code;

(h) incur, assume, guarantee or otherwise become liable for any Indebtedness, or create or permit any Encumbrance on any asset of any Subsidiary;

(f) The Sale Order shall contain an express finding and order that (i) Buyer is a good faith purchaser entitled to all protections of section 363(m) of the Bankruptcy Code; (ii) neither Buyer nor any Buyer Designee is a successor to Seller or liable for any Excluded Liability under any theory of Law or equity; (iii) this Agreement and the Sale Order are binding on any chapter 7 or chapter 11 trustee subsequently appointed in the Bankruptcy Case and shall not be subject to rejection or avoidance; and (iv) the Bankruptcy Court retains exclusive jurisdiction to enforce this Agreement and the Sale Order.

5.10 Milestones. Seller shall use commercially reasonable efforts to satisfy the following milestones (the "Milestones"), in each case unless otherwise agreed in writing by Buyer:

(a) Seller shall seek entry of the Sale Order no later than October 22, 2026;

(b) Provided that Buyer has made its initial designations of the Contracts to be assumed and assigned and has provided Seller with the information reasonably required from Buyer in connection therewith at least three (3) Business Days prior thereto, Seller shall seek to file the Assumption Motion and the related cure notices on or before October 15, 2026, in accordance with and shall seek entry, on or before October 22, 2026, of an order authorizing the assumption and assignment of the Assigned Contracts and fixing the applicable Cure Amounts.

Seller shall use commercially reasonable efforts to prosecute each motion, application, notice or other pleading contemplated by this Agreement.

5.11 Executory Contracts; Assumption and Assignment; Assumption Costs.

(a) Buyer shall have the sole and exclusive right to determine which Contracts of Seller shall be assumed by Seller and assigned to Buyer, and may add any Contract to, or remove any Contract from, Schedule 2 at any time prior to the Closing Date in accordance with Section 2.6. Seller shall not assume, assign, reject or seek authority to reject any Contract designated by Buyer as an Assigned Contract without Buyer's prior written consent.

(b) Promptly following any designation by Buyer, and in any event within three (3) Business Days thereafter, Seller shall file and diligently prosecute the Assumption Motion seeking entry of an order of the Bankruptcy Court authorizing the assumption by Seller and the assignment to Buyer of each Contract so designated and fixing the Cure Amounts payable in respect thereof. Seller shall file such supplemental motions, notices and pleadings as are necessary to give effect to each subsequent designation by Buyer, shall serve all cure notices required by the Bankruptcy Code, the Bankruptcy Rules and the Sale Order on each counterparty to each Assigned Contract, and shall use its best efforts to obtain entry of such order on or before the Closing Date.

(c) All Assumption Costs shall be the sole obligation of Seller. Seller shall pay all Assumption Costs at or prior to the Closing from the Expense and Unsecured Creditor Carveout or from any other source available to it. Buyer's payment obligation is limited to the Purchase Price. Buyer shall have no obligation to pay, and shall bear no liability for, any Assumption Cost, and no Assumption Cost shall reduce, offset or otherwise adjust the Purchase Price.

(d) If the Bankruptcy Court fixes any Cure Amount in an amount greater than the amount proposed in the Assumption Motion, or if any counterparty asserts a Cure Amount greater than that proposed amount, the entire Cure Amount as so fixed or resolved shall remain the sole obligation of Seller. Buyer may in its sole discretion instead remove the affected Contract from Schedule 2 in

the Closing Date, and Buyer shall have complied with and performed in all material respects all covenants, agreements and obligations required to be complied with or performed by Buyer on or before the Closing Date.

7.2 Actions and Proceedings. No Governmental Authority shall have issued any Order or enacted any Law that is then in effect and that enjoins, restrains, makes illegal or otherwise prohibits the consummation of the transactions contemplated by this Agreement.

7.3 Sale Order. The Sale Order shall have been entered by the Bankruptcy Court.

7.4 Closing Deliveries. Buyer shall have executed and delivered, or caused to be executed and delivered, each of the documents and items described in Section 2.10.

## ARTICLE VIII
## TERMINATION; ADDITIONAL AGREEMENTS

8.1 Termination Prior to Closing. This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing, and in no other manner:

(a) by the mutual written consent of Buyer and Seller;

(b) by Buyer, if Seller breaches or fails to perform any of its representations, warranties, covenants or other obligations contained in this Agreement and such breach or failure would give rise to the failure of a condition set forth in Article VI, and (i) such breach or failure is incapable of being cured or (ii) if capable of being cured, such breach or failure has not been cured within ten (10) days following Seller's receipt of written notice describing such breach or failure in reasonable detail; provided that Buyer shall not have the right to terminate pursuant to this Section 8.1(b) if Buyer is then in material breach of this Agreement and such breach would give rise to the failure of a condition set forth in Article VII;

(c) by Seller, if Buyer breaches or fails to perform any of its representations, warranties, covenants or other obligations contained in this Agreement and such breach or failure would give rise to the failure of a condition set forth in Article VII, and (i) such breach or failure is incapable of being cured or (ii) if capable of being cured, such breach or failure has not been cured within ten (10) days following Buyer's receipt of written notice describing such breach or failure in reasonable detail; provided that Seller shall not have the right to terminate pursuant to this Section 8.1(c) if Seller is then in material breach of this Agreement and such breach would give rise to the failure of a condition set forth in Article VI;

(d) by Buyer, if the Closing has not occurred on or before the Termination Date; provided that Buyer may, in its sole discretion, extend the Termination Date by written notice to Seller for one or more periods of up to thirty (30) days each, and provided further that the right to terminate under this Section 8.1(d) shall not be available to Buyer if Buyer's breach has been the primary cause of the failure of the Closing to occur;

(e) by Buyer, if the Sale Order is vacated, stayed, reversed or, without Buyer's written consent, amended, supplemented or modified;

(f) by Buyer or Seller, immediately upon the Bankruptcy Court entering an order approving, or upon the closing of, an Alternative Transaction;

(g) by Buyer, immediately if the Bankruptcy Court fails to enter the Sale Order on or before October 22, 2026;

(h) by Buyer, upon the dismissal of the Bankruptcy Case, the conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, the appointment of a trustee or examiner in the Bankruptcy Case, or the granting of relief from the automatic stay with respect to any Purchased Asset;

(i) by Buyer, if Seller files, supports or fails to oppose any Plan or other pleading that is inconsistent with this Agreement or the transactions contemplated hereby; or

(j) by Buyer, if any change, event, development or occurrence has occurred that has had, or would reasonably be expected to have, a Material Adverse Effect.

The Party seeking to terminate this Agreement pursuant to this Section 8.1, other than pursuant to Section 8.1(a), shall give prompt written notice of such termination to the other Party. Buyer shall be permitted to provide any notice under this Agreement notwithstanding the existence of the Bankruptcy Case or the automatic stay.

8.2 Effect of Termination. In the event of any termination of this Agreement (a) the Sale Order, if entered, shall survive such termination, (b) no termination shall relieve any Party of liability for fraud or for any willful and material breach of this Agreement occurring prior to termination and (c) within one Business Day of the date of termination of this Agreement, Seller shall cause the Deposit, together with all interest thereon, to be returned to Buyer by wire transfer of immediately available funds.

8.3 Post-Closing Filings and Access to Information. After the Closing, each Party shall promptly deliver to the other, upon reasonable request, copies of any post-Closing filings, financial statements or reports regarding the Purchased Assets, the Assumed Liabilities, the Excluded Assets or the Excluded Liabilities reasonably necessary for the requesting Party to prepare and deliver any filing or report required by any Governmental Authority, in each case at the sole cost and expense of the requesting Party.

8.4 Refunds and Remittances. After the Closing, (a) if Seller or any of its Affiliates receives any refund or other amount that is a Purchased Asset or is otherwise properly due and owing to Buyer under this Agreement, Seller shall promptly remit such amount to Buyer, and (b) if Buyer or any of its Affiliates receives any refund or other amount that is an Excluded Asset or is otherwise properly due and owing to Seller under this Agreement, Buyer shall promptly remit such amount to Seller. Without limiting the foregoing, any Account Receivable collected or received by Seller or any of its Affiliates after the Closing that constitutes a Purchased Asset shall be held in trust for Buyer and promptly remitted to Buyer.

8.5 Availability of Business Records. From and after the Closing, Buyer shall (a) upon reasonable notice and during normal business hours, provide Seller and its Representatives with reasonable access to Records included in the Purchased Assets relating to periods prior to the Closing, to the extent necessary for Seller to comply with this Agreement, applicable Law, or any Contract to which it is a party, or for liquidation, winding up or Tax reporting purposes, subject to an obligation of confidentiality acceptable to Buyer, and (b) preserve such Records until the latest of (i) three (3) years after the Closing Date, (ii) the expiration of any applicable retention period required by Law, and (iii) the conclusion of the Bankruptcy Case. From and after the Closing and until the dissolution of Seller, Seller shall, upon reasonable notice and during normal business hours, provide Buyer and its Representatives with reasonable access to, and the right to copy, all books, records, data and information retained by Seller that relate to the Business, the Purchased Assets, the Assumed Liabilities or the Subsidiaries for periods prior to the Closing and are not

convey and transfer to Buyer, and vest in Buyer, full right, title and interest in and to the Purchased Assets and to place Buyer in legal and actual possession thereof.

9.3 Choice of Law; Venue.

(a) This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby, whether in contract or tort, shall be governed by and construed in accordance with the laws of the State of Maryland, without regard to any conflict of law principles.

(b) WITHOUT LIMITING ANY PARTY'S RIGHT TO APPEAL ANY ORDER OF THE BANKRUPTCY COURT, THE PARTIES AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS AND PROCEEDINGS RELATING TO THIS AGREEMENT, THE ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES CONSENT TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT; provided that if the Bankruptcy Case has closed or the Bankruptcy Court lacks jurisdiction, the Parties irrevocably submit to the exclusive jurisdiction of the state and federal courts located in the State of Maryland. The Bankruptcy Court shall retain jurisdiction to decide any matter arising out of this Agreement. The Parties irrevocably waive any objection to venue and any defense of inconvenient forum.

(c) EACH PARTY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION, MATTER OR PROCEEDING REGARDING THIS AGREEMENT, THE ANCILLARY AGREEMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

9.4 Benefit, Assignment and Third-Party Beneficiaries. This Agreement shall inure to the benefit of and be binding upon the Parties and their respective legal representatives, successors and assigns; provided that no Party may assign this Agreement without the prior written consent of the other Party, except that (a) Buyer may assign this Agreement or any of its rights hereunder to any Affiliate of Buyer, or to any purchaser of substantially all of Buyer's business, and (b) Buyer may collaterally assign its rights, but not its obligations, under this Agreement to any Person providing financing to Buyer, in each case without the prior written consent of Seller. Seller may assign its rights or delegate its obligations hereunder to a chapter 7 trustee, chapter 11 trustee, liquidating trust, liquidating trustee, plan administrator or other successor entity only if such Person first delivers to Buyer a separate written undertaking, in form and substance reasonably acceptable to Buyer, agreeing to timely perform all of Seller's obligations under this Agreement and each Ancillary Agreement. No assignment or delegation by any Party shall relieve such Party of any obligation or liability hereunder, and any attempted assignment in violation of this Section 9.4 shall be void *ab initio*. Buyer may designate one or more Buyer Designees in accordance with Section 2.12. Except as expressly provided in this Section 9.4, this Agreement is intended solely for the benefit of the Parties and shall not create any enforceable third-party beneficiary rights.

9.5 Waiver of Breach. The waiver by any Party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to constitute, a waiver of any subsequent breach of the same or any other provision. Any waiver shall be valid only if set forth in a written instrument executed by a duly authorized officer of the waiving Party.

9.6 Notice. Any notice, demand or communication required or permitted under this Agreement shall be in writing and deemed effectively given (a) when personally delivered, (b) on the date sent when delivered by electronic mail, unless not delivered on a Business Day or delivered after 7:00 p.m. Eastern Time on a Business Day, in which case delivery shall be deemed effective on the next Business Day, (c)

one (1) Business Day following the date sent if sent by overnight courier with signed receipt, or (d) when delivered by registered United States mail, postage prepaid and return receipt requested, in each case addressed as follows or to such other address as a Party may designate:

If to Seller:

3CLogic, Inc.
9841 Washingtonian Blvd, Ste #500 Gaithersburg, MD 20878
Attention: Denis Seynhaeve
Email: dseynhaeve@3clogic.com

With a copy to:

McNamee Hosea, P.A.
6404 Ivy Lane, Suite 820
Greenbelt, MD 20770
Attention: Janet M. Nesse, Esq.
Email: jnesse@mhlawyers.com

If to Buyer:

c/o EVA Equity Partners LLC
2028 E Ben White Blvd #240-1032
Austin, TX 78741-6931
Attention: Rangarajan Venkatesan
Email: rangarajan.venkatesan@evaequitypartners.com

With copies to:

Cooley LLP
1144 15th St, Suite 2300
Denver, CO 80202
Attention: Laura Medina
Email: lmedina@cooley.com

and

Cooley LLP
110 N. Wacker Drive, Suite 4200
Chicago, IL 60606-1511
Attention: Eric E. Walker
Email: ewalker@cooley.com

9.7 Severability. If any provision of this Agreement is held to be invalid, illegal or unenforceable for any reason and in any respect, such invalidity, illegality or unenforceability shall not affect, prejudice or disturb the validity of the remainder of this Agreement, which shall remain in full force and effect and enforceable in accordance with its terms.

9.8 Interpretation. In the interpretation of this Agreement, except where the context otherwise requires: (a) "including" and "include" do not denote or imply any limitation and mean "including, without

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

SELLER:
3CLOGIC, INC.,
a Delaware corporation, as debtor and debtor in possession

By: ______________________________
Name: Denis Seynhaeve
Title: Chief Executive Officer

BUYER:
EVA EQUITY PARTNERS, LLC,
a Delaware limited liability company

By: Rangarajan Venkatesan
Name: Rangarajan Venkatesan
Title: CEO

# Exhibit C
# Biography of Ajay Jain

Ajay Jain is an enterprise software founder, executive, and investor whose professional experience dates to 1989. His supplied profile lists him as Founder, President and CEO of a stealth enterprise Agentic AI and LLM startup beginning in November 2024.

He previously founded and led Vector Flow, an AI-powered physical security automation software company. He also founded Quantum Secure, a physical identity and access management software business acquired by HID Global / Assa Abloy, and subsequently served as Vice President and General Manager at HID Global.

Ajay served as General Partner and Managing Director at Nexgen Capital Ventures. Earlier, he founded Mokume Software, which was acquired by Versant, and served as President at Versant. His earlier engineering and executive management experience includes Netscape, Cadence Design Systems, Clarify, and MarketFirst Software.

He holds an MBA in Finance and Marketing from Santa Clara University and an MS in Computer and Information Science from Clarkson University.

Through his investment entities, Ajay also has an indirect economic interest in 3CLogic through Capitan Investment Partners, LLC Series 3CLogic II, which holds the investment in 3CLogic. This investment connection is supplied separately from the professional profile.

The supplied two-page professional profile follows. This biography does not establish that Ajay has been appointed to a role, that financing is committed, or that funds have been verified.

Contact
ajain4131@gmail.com
www.linkedin.com/in/ajay-jain-9b3736 (LinkedIn)

## Top Skills

Cloud Computing
SaaS
Strategic Partnerships

# Ajay Jain

Founder & CEO at Stealth Startup
San Jose, California, United States

## Experience

### Stealth Startup

Founder, President & CEO
November 2024 - Present (2 years)

Agentic AI / LLM for a very important domain in the enterprise

### Vector Flow

Founder & CEO
April 2020 - April 2024 (4 years 1 month)

Vector Flow launched Security Industry's first AI-powered, data-centric Physical Security Automation Platform that derives intelligence from Physical Security Data & IoT Devices by creating domain specific AI and data-centric models to automate major security functions related to Physical Identity & Access Operations, SOC Automation and Cyber-Physical Security defense.

### HID Global

VP & GM. Quantum Secure Acquisition by HID/Assa Abloy
March 2015 - June 2019 (4 years 4 months)
San Jose, CA

Quantum was acquired by Assa Abloy / HID Global (Stockholm: ASSAB)

### Nexgen Capital Ventures, LLC

General Partner & Managing Director
April 2004 - December 2015 (11 years 9 months)

Venture fund dedicated to High Tech and Healthcare opportunities.

### Quantum Secure, Inc. Acquired By HID Global / Assa Abloy

Founder & CEO
April 2005 - March 2015 (10 years)

A Physical Identity & Access Management (PIAM) software category creator company which enables organizations to centrally manage the lifecycle of all types of identities through communication with physical access systems and building technologies.

### Versant Corporation

[redacted]

President Versant. Acquisition of Mokume Software
November 2001 - April 2005 (3 years 6 months)

Mokume was acquired by Versant (Nasdaq: vsnt)

Mokume Software, Inc.
Founder & CEO
November 2001 - November 2002 (1 year 1 month)

Mokume Got Acquired By Versant (Nasdaq: VSNT)

Netscape, Cadence Design Systems, Clarify Corp, MarketFIrst Software
Engineering & Executive Management
January 1989 - November 2001 (12 years 11 months)

## Education

Santa Clara University
MBA, Finance & Marketing · (1990 - 1992)

Clarkson University
MS, Computer & Information Science · (1987 - 1989)

# Exhibit D
# Alternative Proposal Correspondence Excerpts

Transcribed excerpts of forwarded correspondence supplied by Sunil Grover. Selected passages are reproduced below; omissions are identified. The original emails should be retained for authentication.

**October 9 2026 Sunil Grover to Janet Nesse**
Subject: 3clogic - Proposed Alternative to Sale Process
Copied recipients in the supplied thread include Joe Callanan, Glenn Krevlin, and Ajay Jain.

"As briefly outlined earlier, I wanted to share my current perspective on the proposed sale process and a potential alternative path for the company."

[Intervening text omitted.]

"There may be multiple ways to structure this. Ajay Jain, a proven CEO and existing investor in 3CLogic, could step in as interim CEO, co-CEO, or in another appropriate executive role focused on corporate reorganization, refinancing, investor/lender engagement, and the broader restructuring process. Denis could continue to lead day-to-day business operations during the transition, or Ajay and Denis could work together to design a mutually agreed transition plan that best supports the company."

[Intervening text omitted.]

"My objective is not to disrupt the company or diminish the significant work Denis has done. Rather, it is to ensure that the Board and the estate fully evaluate a credible alternative before moving forward with a sale that may not reflect the company's improved operating position."

"I would appreciate your guidance on the appropriate process for presenting this alternative to the Board and, if necessary, to the bankruptcy court."

**October 10 2026 Denis Seynhaeve reply**
To: Sunil Grover
Cc: Joe Callanan, Glenn Krevlin, Ajay Jain
Subject: Re: 3clogic - Proposed Alternative to Sale Process

Sunil,

I spent the past 3 months trying to delay the sale process as much as possible while keeping the business on track.

We all knew that refinancing the company required finding $4-5M in new equity investment.

Unfortunately, neither you nor anyone else has been able to secure that amount.

I have no issue with any transition plan, including the one you outlined.

But unless Ajay Jain brings the required financial backing, the court will not be moved and our lender will force the sale.

Let me know how I can help.

Denis Seynhaeve
3CLogic - Chairman and CEO

# Exhibit E

Selected pages of the Series B Preferred Stock and Warrant Purchase Agreement.

PDF pages 1 and 34 follow, identifying Capitan Investment Partners, LLC Series 3CLogic II and listing its investment.

This historical agreement does not independently establish current ownership, the IRA membership interest, or authority to act for Capitan.

**3CLOGIC, INC.**
**SERIES B PREFERRED STOCK AND WARRANT PURCHASE AGREEMENT**

This **SERIES B PREFERRED STOCK AND WARRANT PURCHASE AGREEMENT** (the "***Agreement***") is made and entered into as of February [26], 2020, by and among **3CLOGIC, INC.**, a Delaware corporation (the "***Company***"), and **CAPITAN INVESTMENT PARTNERS, LLC SERIES 3CLOGIC II**, a Delaware limited liability company ("***Capitan***"), and each person and entity whose name is set forth on the Schedule of Purchasers attached to this Agreement as **EXHIBIT A** (collectively, with Capitan, the "***Purchasers***" and individually, a "***Purchaser***").

The parties agree:

**1. PURCHASE AND SALE OF PREFERRED STOCK.**

**1.1 Authorization of Shares Warrant and Warrant Shares.**

**(a)** The Company has authorized the issue and sale of up to 63,291,135 shares of its Series B-1 Preferred Stock, $0.0001 par value (the "***Series B-1 Preferred Stock***"), 46,486,130 of shares of its Series B-2 Preferred Stock, $0.0001 par value (the "***Series B-2 Preferred Stock***" and, with the Series B-1 Preferred Stock, the "***Series B Preferred Stock***") and Contingent Warrants to purchase 27,444,311 of shares of its Common Stock, $0.0001 par value per share (the "***Common Stock***") at the exercise price and upon the terms in **EXHIBIT B** ("***Warrants***"). The rights, privileges, and preferences of the Series B Preferred Stock are set forth in the Amended and Restated Certificate of Incorporation of the Company in the form attached to this Agreement as **EXHIBIT C** (the "***Restated Charter***").

**(b)** Subject to the terms and conditions of this Agreement, each Purchaser shall purchase at the Closing (as defined below) and the Company shall sell and issue to each Purchaser at the Closing the number of shares of Series B Preferred Stock and a Warrant to purchase a number of shares of Common Stock, as set forth opposite each Purchaser's name on **EXHIBIT A**, at a purchase price of $0.079 per share (the "***Purchase Price***"). The Shares of Series B Preferred Stock issued to Purchasers under this Agreement (including shares issued at the Initial Closing and at any subsequent Closings) are referred to as the "***Shares***." The Shares and the Warrants are referred to as the "***Securities***".

**1.2 Use of Proceeds.** Proceeds from the sale of the Shares shall be used for working capital and general corporate purposes.

**1.3 Consent to Note Conversion and Termination.**

(a) By executing and delivering this Agreement, any Purchaser holding convertible promissory notes (each, a "***Note***" and collectively, the "***Notes***") issued by the Company and identified on **EXHIBIT A** as a holder of a Note (each such Purchaser, a "***Note Holder***") pursuant to the Note Purchase Agreement (as defined in the Disclosure Schedules) (each a "***Note Purchase Agreement***" and collectively, the "***Note Purchase Agreements***") hereby irrevocably agrees that:

(i) such Note Holder's Note or Notes shall automatically and without any action of the part of the Note Holder convert into that number of shares of Series B-2 Preferred Stock set forth on **EXHIBIT A** at the Initial Closing, regardless of whether any such Note or an affidavit of loss therefor is actually delivered in original or other form to the Company (collectively, the "***Note Conversions***");

# EXHIBIT A

## 3CLOGIC, INC.
## SCHEDULE OF SERIES B PREFERRED PURCHASERS
## INITIAL CLOSING DATE: FEBRUARY [26], 2020

| NAME | SERIES B-1 SHARES FROM CASH | CASH PAID | SERIES B-2 SHARES FROM CONVERTING NOTES | NOTE AMOUNT | WARRANT SHARES |
|---|---|---|---|---|---|
| Denis Seynhaeve | 3,797,468 | $299,999.98 | 2,761,287 | $218,141.68 | 1,639,688 |
| Laure Seynhaeve | 0 | $0.00 | 2,735,304 | $216,089.04 | 683,826 |
| Andre G. Seynhaeve Trust | 0 | $0.00 | 12,924,272 | $1,021,017.50 | 3,231,068 |
| Gama Foundation | 0 | $0.00 | 853,953 | $67,462.33 | 213,488 |
| Force V Partners | 5,696,202 | $449,999.96 | 6,953,190 | $549,302.05 | 3,162,348 |
| Force 3 Partners | 0 | $0.00 | 3,688,022 | $291,353.77 | 922,005 |
| Blu Venture Investors, LLC | 0 | $0.00 | 9,330,206 | $737,086.44 | 2,332,552 |
| Raymond Rice Trust | 3,797,468 | $299,999.98 | 5,103,693 | $403,191.78 | 2,225,290 |
| Gerry Preville | 316,455 | $24,999.95 | 0 | | 79,113 |
| G. Seynhaeve | 1,582,278 | $124,999.97 | 451,704 | $35,684.66 | 508,495 |
| Vikas Nehru | 0 | $0.00 | 427,171 | $33,746.58 | 106,792 |
| Matt Durkin | 0 | $0.00 | 1,257,326 | $99,328.77 | 314,331 |
| Capitan Investment Partners, LLC Series 3CLogic II | 35,443,037 | $2,799,999.93 | 0 | $0.00 | 8,860,759 |
| TOTAL | *50,632,908* | *$3,999,999.77* | *46,486,130* | *$3,672,404.59* | *27,444,311* |

# Exhibit F

Notice of Hearing and Opportunity to Object to the Motion for Approval of Compromise and Settlement between the Debtor and RCF2, LLC.

Docket No. 124, filed October 9, 2026. All four supplied notice pages follow.

The notice makes the October 20 settlement objection deadline and October 22 settlement hearing conditional on approval of the request to shorten time or expedite. Operative orders control.

The separately referenced Exhibit A and mailing matrix are not part of these four supplied pages.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

| | |
|---|---|
| In re:<br><br>3CLOGIC, INC.,<br><br>*Debtor and Debtor-in-Possession.* | Case No. 26-17338-MCR<br>Chapter 11 |

**NOTICE OF HEARING AND OPPORTUNITY TO OBJECT TO MOTION FOR APPROVAL OF COMPROMISE AND SETTLEMENT BETWEEN THE DEBTOR AND RCF2, LLC AS SECURED LENDER**

**PLEASE TAKE NOTICE THAT** 3CLogic, Inc., as the debtor and debtor-in-possession (the "Debtor"), by and through its counsel, McNamee Hosea, P.A., has filed its *Motion for Order Approving Compromise and Settlement between the Debtor and RCF2, LLC as Secured Lender* (the "Motion"), pursuant to Fed. R. Bankr. P. 9019, seeking Court approval of a settlement agreement (the "Agreement") between Debtor and RCF2, LLC as its secured lender (the "Secured Lender") for the distribution of funds after sale of substantially all Debtor's assets to the buyer Partner One Capital Inc. (the "Buyer") or whatever buyer the Court approves.

Upon the receipt of the Buyer's full payment at closing, the sum of 15,681,217.39, plus accrued and unpaid Secured Lender expenses, shall be distributed as described in the Agreement (see Exhibit A) Upon confirmation of cleared funds, the Secured Lender shall release all claims it may have against the Debtor and its bankruptcy estate, subject to the terms of the Agreement and the availability of additional funds. Your rights may be affected. You should read these papers carefully and discuss them with your lawyer, if you have one in this bankruptcy case. (If you do not have a lawyer, you may wish to consult one.)

This Motion is subject to the approval of the Court after notice to all creditors entitled to such notice. Debtor believes that the Agreement on the terms stated in the Motion is fair and reasonable and is in the best interests of the bankruptcy estate and its creditors and should be approved. A copy of the Motion will be mailed to any party who requests one from the undersigned.

**Ordinarily you would have twenty-one (21) days after the date of this Notice to object. PLEASE TAKE NOTICE THAT THE DEBTOR HAS SIMILTANEOUSLY HEREWITH FILED A MOTION TO SHORTEN TIME FOR RESPONSE. If THE MOTION IS GRANTED YOU WILL HAVE THROUGH OCTOBER 20, 2026 TO OBJECT TO THE TERMS OF THE 9019 SETTLEMENT DESCRIBED IN THIS NOTICE.**

**YOU MUST SERVE A TIMELY WRITTEN OBJECTION TO THE MOTION IF YOU INTEND TO OBJECT TO THE COMPROMISE.** ANY OBJECTION AND

PROPOSED ORDER MUST BE FILED WITH THE CLERK, U.S. BANKRUPTCY COURT, SUITE 300, U.S. COURTHOUSE, 6500 CHERRYWOOD LANE, GREENBELT, MARYLAND 20770, AND SERVED BY DELIVERY OR BY MAILING OR EMAILING A COPY TO THE UNDERSIGNED. THE OBJECTION MUST CONTAIN A COMPLETE SPECIFICATION OF THE FACTUAL AND LEGAL GROUNDS UPON WHICH IT IS BASED. YOU MAY APPEND AFFIDAVITS AND DOCUMENTS IN SUPPORT OF YOUR OBJECTION.

A HEARING IS CURRENTLY SET ON **OCTOBER 22, 2026, at U.S. BANKRUPTCY COURT, Courtroom 3-C, 6500 CHERRYWOOD LANE, GREENBELT, MARYLAND 20770 at 1 PM FOR DEBTOR'S MOTION TO SELL ALL ASSETS OF THE ESTATE.** PURSUANT TO MARYLAND LOCAL BANKRUPTCY RULE 9013-6, AS THE MOVANT HAS ALSO FILED A MOTION TO SHORTEN THE TIME FOR RESPONSE AND/OR FOR AN EXPEDITED HEARING, IF THAT MOTION TO SHORTEN OR EXPEDITE IS GRANTED, MOVANT IS REQUESTING THAT THE HEARING ON THIS MOTION TAKE PLACE AT THAT SAME TIME.

IF YOU FAIL TO FILE A TIMELY OBJECTION, THE MOTION MAY BE GRANTED BY THE COURT WITHOUT A HEARING. THE COURT MAY GRANT THE MOTION WITHOUT HEARING IF THE OBJECTION FILED STATES INADEQUATE GROUNDS FOR DENIAL. PARTIES IN INTEREST MAY CONTACT THE UNDERSIGNED WITH QUESTIONS.

You or your lawyer must also mail or email a written response to Janet M. Nesse, Esq, at the address set forth below. If you mail, rather than deliver, your response to the Clerk of the Bankruptcy Court for filing, you must mail it early enough so that the Court will receive it by the date stated above.

IF YOU OR YOUR LAWYER DO NOT TAKE THESE STEPS BY THE DEADLINE, THE COURT MAY DECIDE THAT YOU DO NOT OPPOSE THE RELIEF SOUGHT IN THE MOTION AND MAY GRANT OR OTHERWISE DISPOSE OF THE MOTION WITHOUT A HEARING.

Dated: October 9, 2026

Respectfully Submitted,

MCNAMEE HOSEA, P.A.

/s/ *Janet M. Nesse*
Janet M. Nesse (Fed. Bar No. 07804)
Justin P. Fasano (Fed. Bar No. 28659)
McNamee Hosea, P.A.
6404 Ivy Lane, Suite 820
Greenbelt, MD 20770
(301) 441-2420
jnesse@mhlawyers.com
jfasano@mhlawyers.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 9, 2026, a true and correct copy of the foregoing was served electronically by the Court's CM/ECF system and/or by electronic mail upon all registered users of CM/ECF in this case, including:

- Brent C. Strickland bstrickland@whitefordlaw.com
  *Counsel for RCF2, LLC*

- L. Jeanette Rice jeanette.rice@usdoj.gov
  *Office of the U.S. Trustee*

- Courtney L. Morgan Courtney.l.morgan@usdoj.gov
  *Office of the U.S. Trustee*

- US Trustee – Greenbelt USTPRegion04.GB.ECF@USDOJ.GOV

**I FURTHER CERTIFY** that on this October 9, 2026, a copy of the foregoing was served by first class mail, postage prepaid, to:

Office of the United States Trustee
6305 Ivy Lane, Suite 600
Greenbelt, MD 2077

W. Austin Jowers
King & Spalding LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309

Jordan Leu
King & Spalding LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201

And the twenty largest creditors as set out on the attached mailing matrix.

*/s/ Janet M. Nesse*
Janet M. Nesse

# Exhibit G

Declaration of Denis Seynhaeve at Docket No. 128-1.

All five supplied pages, executed October 8, 2026 and filed October 9, 2026. The declaration addresses the proposed RCF2 settlement and its benefits.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

In re: *

3CLOGIC, INC., Case No. 26-17338-MCR

* Chapter 11

Debtor.

*

* * * * * * * *

DECLARATION OF DENIS SEYNHAEVE

1. My name is Denis Seynhaeve. I am over the age of eighteen and am fully competent to make this declaration. I have never been convicted of a felony or a crime involving moral turpitude.

2. I am the Chairman and Chief Executive Officer of 3CLogic, Inc., the debtor and debtor in possession in the above-captioned chapter 11 case (the "Debtor" or the "Company"). I have held those roles since 2014. Based on my work for the Company, I have personal knowledge of the facts stated in this declaration.

3. The Debtor is a Delaware corporation whose business includes developing, licensing, providing, hosting, operating, maintaining, supporting, marketing, and selling cloud-based and AI-powered contact center, communications, customer and employee engagement, and customer experience software, platforms, and solutions, together with related artificial intelligence, automation, analytics, enterprise integration, implementation, professional, customer success, and support services.

4. RCF2, LLC (the "Secured Lender") holds a pre-petition secured claim against the Debtor arising under a Loan and Security Agreement dated as of February 23, 2021 (the "Loan

Agreement"), and certain related amendments, promissory notes, and other "Loan Documents" as defined in the Loan Agreement (collectively, the "RCF Loan Documents").

5. From February 2021 through August 2025, the Secured Lender made seventeen (17) Advances (as defined in the RCF Loan Documents) to the Company in an aggregate original principal amount of $15,000,000.00.

6. As of the Petition Date, the amount due and owing from the Company to the Secured Lender, inclusive of principal plus accrued and unpaid interest at the non-default contractual interest rate, was not less than $15,681,217.39 (the "Pre-Petition Secured Claim"), plus accrued and unpaid "Lender Expenses" as defined in the RCF Loan Documents.

7. Prior to July 9, 2026 (the "Petition Date"), Events of Default had occurred under the RCF Loan Documents. For example, the Company did not make the required principal payments due on July 1, 2026 (totaling approximately $6.05 million). The Company also did not pay interest at the Default Rate (as defined in the RCF Loan Documents) when it made the other interest payments due on June 1, 2026.

8. As of the Petition Date, the Secured Lender had delivered two letters (the "Default Notices") to the Company: a May 15, 2026, letter titled "Notice of Events of Default Under Loan Agreement; Reservation of Rights; Request for Information," and a June 4, 2026, letter titled "Second Notice of Events of Default Under Loan Agreement; Demand for Payment and Compliance; Reservation of Rights." For the avoidance of doubt, the Debtor does not concede all of the alleged breaches of covenants set forth in the Default Notices.

9. Partner One Capital Inc., or another party reasonably acceptable to the Secured Lender and approved by the Bankruptcy Court after notice and the opportunity for hearing (the "Buyer"), proposes to acquire substantially all of the assets of the Debtor (the "Purchased

Assets") through a private sale (the "Proposed Transaction") by motion made in accordance with sections 105, 363(b), 363(f), and 365 of the Bankruptcy Code.

10. The Secured Lender and the Debtor, each represented by sophisticated and experienced counsel, have engaged in extensive, arm's-length negotiations regarding the terms of the Proposed Transaction, including the Secured Lender's consent thereto, the treatment of the amounts due to the Secured Lender (including without limitation the Pre-Petition Secured Claim), and the allocation of sale proceeds.

11. The Debtor, in the exercise of its business judgment, has determined that the settlement terms as set forth in the Term Sheet are in the best interest of the Debtor's estate and its creditors.

12. The settlement resolves, on amicable terms, potential disputes the pursuit of which would be costly and time-consuming and would pose risks to the estate. Without limitation, it allows administrative claimants and general unsecured creditors to receive payment before the Secured Lender receives any payment of post-petition interest. In addition, it increases the amount available for distribution to other stakeholders because the Secured Lender is waiving the right to recover interest at the Default Rate or any Prepayment Premiums (as defined in the RCF Loan Documents).

13. Absent the settlement, the Debtor's estate and the Secured Lender face the prospect of litigation over, among other things, the timing of the first Event of Default under the RCF Loan Documents and, accordingly, the amount (if any) of interest due at the Default Rate. The Debtor's estate also may have disputes regarding the amount of Cash Collateral that was subject to a perfected pre-petition security interest in favor of the Secured Lender because the Debtor had deposit accounts that were not subject to a Deposit Account Control Agreement in

favor of the Secured Lender, and about the value of the Secured Lender's collateral as of the Petition Date, which the Debtor has not conceded. The settlement eliminates this uncertainty by establishing clear terms for the treatment of the Secured Lender's claims and the allocation of sale proceeds—terms which waive any interest at the Default Rate and also waive any Prepayment Premium—all of which I believe will inure to the benefit of stakeholders other than the Secured Lender. Moreover, although the Debtor disputes the calculation of interest due at the Default Rate because the Debtor disputes the nature and timing of the Events of Default occurring prior to the Petition Date, after diligent investigation, the Debtor is unaware of any basis on which it could challenge the security interests and perfection associated with the Pre-Petition Secured Claim as set forth above, or of any basis for extracontractual claims against the Secured Lender. I therefore believe that the prospect of meaningful success on any causes of action against the Secured Lender is relatively small.

14. In addition, I believe that litigation against the Secured Lender would consume significant estate resources, could delay the closing of the Proposed Transaction, and likely would diminish the value available for distribution to creditors of all priorities.

15. I understand that the Secured Lender and its affiliates and related persons will receive releases as part of the settlement. I believe these releases are appropriate in light of the Secured Lender's significant concessions, including the waiver of Prepayment Premiums and interest at the Default Rate, the provision of the Expense and Unsecured Creditor Carveout (as defined in the Term Sheet), and the Secured Lender's consent to the Proposed Transaction.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on October 8, 2026.

Denis Seynhaeve

# Exhibit H

Deficiency notice at Docket No. 130, dated October 13, 2026.

The notice identifies a missing proposed order for Docket No. 125 and a cure date of October 27. It does not itself suspend an objection deadline, deny expedition or continue a hearing.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**at Greenbelt**

In re: Case No.: **26–17338 – MCR** Chapter: **11**

**3CLogic, Inc.**
Debtor

# DEFICIENCY NOTICE

DOCUMENT: 125 – Motion to Expedite Hearing ON AND SHORTEN DEADLINE TO OBJECT TO DEBTORS MOTION FOR ORDER APPROVING COMPROMISE AND SETTLEMENT BETWEEN THE DEBTOR AND RCF2, LLC AS SECURED LENDER Filed by 3CLogic, Inc. (related document(s)121 Motion for Miscellaneous Relief filed by Debtor 3CLogic, Inc.). (Nesse, Janet)

PROBLEM: **The following items are deficient for the above pleading, and must be cured by 10/27/26. Missing proposed order.**

CURE: Please upload a proposed order and link it to [125].

CONSEQUENCE: Failure to cure the problem by the date above may result in the pleading being stricken or other action the Court deems appropriate without further notice. For a proposed order, the failure to cure the problem may result in the relief sought being denied for want of prosecution.

**Additional information on filing requirements: http://www.mdb.uscourts.gov/content/filing–requirements.**
**Additional information for non–attorney filers: http://www.mdb.uscourts.gov/content/after–filing.**

Dated: 10/13/26

Mark A. Neal, Clerk of Court
by Deputy Clerk, Kelly Horning
301–344–3393

cc: Debtor
Attorney for Debtor – Janet M. Nesse

defntc (rev. 09/01/2025)

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION
In re 3CLogic, Inc., Debtor
Case No. 26-17338-MCR | Chapter 11

# Proposed Order Granting a Conditional Evaluation Period

Upon consideration of Sunil Grover's Limited Objection and Motion for a Conditional Continuance, responses, and the record, and upon determining that the request may properly be considered, it is ORDERED:

1. Final disposition of the sale motion and related settlement, to the extent needed to preserve evaluation of an alternative, is deferred for a 30-calendar-day evaluation period from entry of this Order, subject to earlier review or modification. A progress review shall occur on or as near as practicable to day 14, with final hearing dates and evidence deadlines set by separate notice or order.

2. Within three calendar days, the Debtor shall provide available current cash information, existing forecasts, essential operating obligations, applicable cash-collateral restrictions, debt information and material sale deadlines to participants authorized by the Debtor or the Court, subject to appropriate confidentiality protections. Any inability to provide the information shall be reported promptly.

3. The Debtor shall promptly assess and seek any buyer deadline accommodation necessary to preserve an available sale during evaluation, and shall report actual contractual and commercial risks. This Order does not amend an asset purchase agreement, require a purchaser to remain, or waive purchaser termination rights.

4. Sunil Grover may file and serve available supplemental evidence on or before day seven, an updated progress report on or before day 14, and a documented financing and reorganization proposal on or before day 30, subject to different deadlines set by further order. Each submission shall distinguish verified funding, conditional proposals, and unresolved conditions.

5. At the progress review, continued evaluation shall depend on demonstrated liquidity or documented interim funding, appropriate creditor protection, meaningful financing progress, and consideration of actual sale risks. The Debtor shall evaluate sufficiently documented proposals and report net-recovery, liquidity and execution concerns. Any party may request earlier review if those conditions deteriorate or milestones are missed.

6. Existing cash-collateral orders and other restrictions remain effective. This Order does not approve financing, appoint management, determine plan confirmation or exclusivity rights, invalidate lender claims, or adjudicate the rights of Capitan Investment Partners, LLC Series 3CLogic II. No extension beyond the evaluation period is automatic.

**Copies to**

Sunil Grover at the address shown in his signed filing; Janet M. Nesse, McNamee Hosea, P.A., 6404 Ivy Lane, Suite 820, Greenbelt, MD 20770; Office of the U.S. Trustee, 6305 Ivy Lane, Suite 600, Greenbelt, MD 20770; all persons listed with their names and current service addresses in the completed certificate of service attached to the motion, incorporated here as the distribution list.

END OF ORDER

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION
In re 3CLogic, Inc., Debtor
Case No. 26-17338-MCR | Chapter 11

# Certificate of Service

I certify that on [actual date of service], I served a true copy of Sunil Grover's Limited Objection and Motion for a Conditional Continuance, declaration, Attachment 1, Exhibits A–H and proposed order upon each person listed below by the actual method stated. Additional required recipients appear in the attached completed service list. I have verified the recipients and permitted methods against the operative notices and orders.

**Janet M. Nesse and Justin P. Fasano**
Debtor counsel, McNamee Hosea, P.A., 6404 Ivy Lane, Suite 820, Greenbelt, MD 20770; jnesse@mhlawyers.com; jfasano@mhlawyers.com
Actual method: [method]
Date sent or delivered: [date]

**Office of the U.S. Trustee**
Attention Courtney L. Morgan and L. Jeanette Rice, 6305 Ivy Lane, Suite 600, Greenbelt, MD 20770
Actual method: [method]
Date sent or delivered: [date]

**Brent C. Strickland**
RCF2 counsel, [verify current street service address]; bstrickland@whitefordlaw.com
Actual method: [method]
Date sent or delivered: [date]

**Partner One Capital Inc. and counsel**
[Insert exact entity, counsel and current addresses from operative sale notice]
Actual method: [method]
Date sent or delivered: [date]

**EVA Equity Partners, LLC**
c/o EVA Equity Partners LLC, 2028 E Ben White Blvd #240-1032, Austin, TX 78741-6931, Attention Rangarajan Venkatesan; verify current service address against notice
Actual method: [method]
Date sent or delivered: [date]

**Laura Medina**
Cooley LLP, 1144 15th St, Suite 2300, Denver, CO 80202; verify current service address against notice
Actual method: [method]
Date sent or delivered: [date]

**Eric E. Walker**
Cooley LLP, 110 N. Wacker Drive, Suite 4200, Chicago, IL 60606-1511; verify current service address against notice
Actual method: [method]
Date sent or delivered: [date]

**W. Austin Jowers**
King & Spalding LLP, 1180 Peachtree Street, NE, Suite 1600, Atlanta, GA 30309
Actual method: [method]
Date sent or delivered: [date]

**Jordan Leu**
King & Spalding LLP, 2601 Olive Street, Suite 2300, Dallas, TX 75201
Actual method: [method]
Date sent or delivered: [date]

**Additional required recipients**
[Attach a complete list of each additional name, title if applicable, current address, actual method and date. Obtain the referenced creditor matrix and all operative sale and settlement notices. Do not certify an incomplete list.]

Executed at: [City, state]
Dated: ____________________
Signature: __________________________________
Sunil Grover